*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-AA-174

NBC SUBSIDIARY WRC-TV, LLC, PETITIONER,

v.

DISTRICT OF COLUMBIA OFFICE OF TAX AND REVENUE, RESPONDENT.

On Petition for Review of an Order of the District of Columbia
Office of Administrative Hearings
(OTR-17-13)

(Argued October 8, 2015                                   Decided October 22, 2015)

*Todd A. Lard*, with whom *Charles C. Kearns* was on the brief, for petitioner.

*Mary L. Wilson*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Loren AliKhan*, Deputy Solicitor General, were on the brief, for respondent.

Before FISHER and THOMPSON, *Associate Judges*, and FARRELL, *Senior Judge*.

FARRELL, *Senior Judge*: Petitioner WRC-TV, LLC (WRC), a television station in the District of Columbia wholly owned and operated by NBC Universal Media LLC, was assessed a tax deficiency of $78,784.84 in sales and use tax by the District's Office of Tax and Revenue (OTR), on the ground that WRC is not a

Qualified High Technology Company (QHTC) as defined by D.C. Code § 47-1817.01 (5)(A)(iii)(II) (2001), hence is not eligible for preferential tax treatment that the District grants to such companies. An Administrative Law Judge (ALJ) of the Office of Administrative Hearings upheld the assessment in a ruling that WRC contends adopted an overly-narrow reading, advanced by the OTR, of what constitutes a QHTC. As relevant here, the statutory definition of a Qualified High Technology Company is not unambiguous, and we thus regard this as a case justifying significant deference to OTR's reasonable understanding of a statute that it administers. *See Washington Gas Light Co. v. Pub. Serv. Comm'n*, 982 A.2d 691, 710-11 (D.C. 2009); *see also District of Columbia Office of Tax & Revenue v. BAE Sys. Enter. Sys., Inc.*, 56 A.3d 477, 481 (D.C. 2012). Because the limitation OTR has imposed on the meaning of a QHTC is reasonable against the legislative background, we affirm the ALJ's decision.

## I.

WRC claims to be a QHTC under § 47-1817.01 (5)(A)(iii) because it derives at least 51% of its gross revenues from:

> (II) Information and communication technologies, equipment and systems that involve advanced computer software and hardware, data processing, visualization technologies, or human interface technologies, whether deployed on the Internet or other electronic or digital media. Such technologies shall include operating and applications software; Internet-related services, including design, strategic planning, deployment, and management services and artificial intelligence; computer modeling and simulation; high-level software languages; neural networks; processor architecture; animation and full-motion video; graphics hardware and software; speech and optical character recognition; high-volume information storage and retrieval; data compression; and multiplexing, digital signal processing, and spectrum technologies.

WRC argues specifically that it meets that definition because "it *generate*[*s*] its receipts from information and communication technologies" (Reply Br. for WRC at 11; emphasis added), in the sense that it "*uses* [advanced] technologies, equipment and systems" (*id.* at 6; emphasis added) to create and transmit the television programming from which it derives most of its revenue through on-air advertising.[1]

---

[1] As WRC contended before the ALJ, businesses buy advertising from it because of the company's "advanced distribution of quality, popular video content via advanced communications and information technologies"; and its revenues are generated by "distributing advertising from companies that use WRC's high technology platform to interact with their customers."

OTR's contrary argument to the ALJ was — and is to us — that subsection (5)(A)(iii)(II)'s language requires a much closer nexus between the activities listed in paragraph (II) and a QHTC's revenues than purchase and use of high technology equipment and systems, or else any company otherwise meeting the definition[2] would gain preferred tax treatment by investing heavily in information and communication technologies that it in turn uses to market its products or services. If WRC's sale of advertising via technology-enabled television programming counts as a QHTC activity, OTR maintains, then so would a similar technology-intensive provision of services for fees (in place of advertising) by, for instance, accounting, brokerage, or even law firms, with the resulting danger of a tax exemption swallowing up the taxation rule. OTR contends that the QHTC tax preferences instead were enacted to incentivize companies engaged in the *development* and marketing of high technology systems and applications to locate in the District of Columbia, rather than provide a boon to companies that purchase the technology to generate revenues from other sources.

---

[2] A QHTC is "[a]n individual or entity organized for profit and maintaining an office, headquarters, or base of operations in the District of Columbia," "[h]aving 2 or more employees," and "[d]eriving at least 51% of its gross revenues from" the listed activities. Section 47-1817.01 (5)(A)(i)-(iii).

The language itself of subsection (5)(A)(iii)(II) furnishes support, though not unqualifiedly, for OTR's understanding. Although the broad reference to "[i]nformation and communication technologies . . . that involve advanced computer software and hardware [etc.]" could be read to include purchaser-users as well as developers or makers of those technologies, other enumerated activities point instead to the originating, enabling or supporting of high-technology use, as, for example, the "design, strategic planning, deployment, and management" of "[i]nternet-related services." We think, though, that the statutory language alone — a long enumeration of activities without specific focus on who, consumer/users or maker/developers, is engaged in them — does not answer the question before us. OTR agrees and thus directs our attention, as it did the ALJ's, to the legislative history of the QHTC statute.

## II.

The enactment originated in Bill 13-752, the "New E-Conomy Transformation Act of 2000." The accompanying committee report states that the Act was designed to increase public revenues in the District of Columbia by promoting the entry and expansion of "the 'new' high technology economy" in the

District.[3] Growth in this sector had formerly been "driven by and [was] associated with pre-existing activity in Northern Virginia and surrounding suburbs," and the Act's tax incentives, designed to counteract this by increasing the presence of high-technology companies in the District, were projected to generate tax revenues in the long run after initial time-limited tax reductions.[4] This statement of purpose, we observe, contains no hint that the D.C. Council saw advantage in providing tax exemptions to companies that merely use technology in their business, as well as to "New E-Conomy" companies engaged in developing and producing such technologies.

In a revenue analysis accompanying the committee report the District's Chief Financial Officer (CFO), through a deputy, estimated how many high-technology companies would benefit from the Act's incentives, and how many new jobs would be created thereby. In doing so the CFO used data regarding jobs in the high-technology industry taken from the American Electronics Association's *Cyberstates*: *A State-by-State Overview of the High-Technology Industry* (4th ed.

---

[3] D.C. Council, Report on Bill 13-752 at 1 (Oct. 19, 2000).

[4] *Id*. at 1, 9.

2000) (*Cyberstates 2000*).[5] The AEA's data in turn was based on a definition of high-technology businesses that encompassed forty-five standard industrial classification (SIC) codes used by federal agencies in the *Standard Industrial Classification Manual* 1987 (*SIC Manual*).[6] The AEA's definition included SIC code 3663, "Radio and Television Broadcasting and Communications Equipment," defined as "[e]stablishments primarily engaged in manufacturing radio and television broadcasting and communications equipment."[7] It did not include SIC code 4833, "Television Broadcasting Stations," defined as "[e]stablishments primarily engaged in broadcasting visual programs by television to the public, except cable and other pay television services."[8] Nor did the AEA include SIC code 7313, "Radio, Television, and Publishers' Advertising Representatives," defined as "[e]stablishments primarily engaged in soliciting advertising on a contract or fee basis for newspapers, magazines, and other publications, or for

---

[5] The American Electronics Association (AEA) was then "the nation's largest high-tech trade association." *Cyberstates 2000* at 2.

[6] *Cyberstates 2000* at 130.

[7] *SIC Manual* at 229; *Cyberstates 2000* at 130.

[8] *SIC Manual* at 283; *Cyberstates 2000* at 130-31.

radio and television stations."[9]   In his report to the Council, the CFO recognized that the definition of a high-technology business based on the SIC codes would "not include some companies . . . that may tangentially [be] involved in the provision of 'e-commerce related' products and services."   Although the AEA's definition reflected that "cable and other pay television services" might be linked closely enough to the creation — "manufacturing" — of high-technology for television broadcasting, it otherwise made no place for broadcasting paid for in the traditional way of on-air advertising.

Important too is the *Cyberstates 2000's* recognition that the definition of a high-technology industry was in flux, that a new classification system being developed was expected to overcome limitations in the use of the SIC codes, and that the AEA would "re-evaluate its present definition" once the new system, known as the North American Industrial Classification System" (NAICS), was in place.  Most recently, *Cyberstates 2015*: *The Definitive State-by-State Analysis of the U.S. Tech Industry*" (*Cyberstates 2015*), has fully adopted the NAICS classification system.  Roughly in keeping with the *Cyberstates 2000* definition but more precisely, it includes in the meaning of the high-technology industry "the

---

[9]  *SIC Manual* at 360; *Cyberstates 2000* at 130-31.

sectors involved in making, creating, enabling, integrating, or supporting technology, whether as a product or service."[10]  Indeed, long before *Cyberstates 2015* was published, an expert in the field, Daniel E. Hecker, identified factors being used by the NAICS to distinguish "high-tech" companies from others, including:   (1) a high proportion of scientists, engineers, and technicians as employees; (2) a high proportion of employees engaged in research and development; (3) the production of high-tech products; and (4) the use of high-tech production methods.[11]  Consistent with these criteria, *Cyberstates 2015's* definition of high technology "does not include industry sectors categorized primarily as users of technology."[12]  And even in 2005 Hecker could state that "both cable networks and program distribution, on the one hand, and radio and TV broadcasting, on the other," were not included in the high-tech list despite being "heavy purchasers of communications equipment."  Hecker concluded that "[i]t is difficult to make a case for classifying these industries as high tech solely on the

---

[10]  *Cyberstates 2015* at 116.

[11]  Daniel E. Hecker, *High-technology Employment:  A NAICS-based Update* Monthly Lab. Rev., July 2005, at 58 (2005 Hecker).  *See also* Daniel E. Hecker, *High-technology Employment*:  *A Broader View*, Monthly Lab. Rev., June 1999.

[12]  *Cyberstates 2015* at 116.

basis of their intense investment in the output of high-tech industries."[13]

Even if we cannot say confidently that the D.C. Council had these precise factors and limitations in mind in defining a Qualified High Technology Company in 2000, the supposition is likely that it was willing to grant substantial latitude to OTR in interpreting the definition over time as the industry's own understanding evolved of what high technology means.  OTR has exercised that judgment in this case, and its conclusion accepted by the ALJ that investing in and using technology to earn advertising revenue from television programming, without more, does not come within the meaning of QHTC activity is reasonable and must be sustained.

*Affirmed.*

---

[13]  2005 Hecker at 69.